# LORA M. L. CORTLAND THOMAS ET AL.

## *vs.*

# JAMES WAKEFIELD CORTLAND.

*Undue influence: effective at time of execution of will; issues for jury; prayers; refusal of correct.*

Where the evidence is legally sufficient to meet the burden of proof, but is conflicting, it is exclusively within the province of the jury to weigh it, upon proper instructions from the Court upon the law applicable to the facts of the case, and the jury's conclusion of fact cannot be reviewed on appeal, and must stand, unless there was substantial error in the ruling of the Court.                                                     p. 672

Unless the influence which the law terms "undue influence" was effective at the time the will was executed, the will cannot be said to be the product of undue influence.          p. 675

Where issues involving the question of whether undue influence was exerted to affect the execution of a will are sent to a jury for determination, prayers are erroneous which, in submitting the question to them, do not limit the consideration as to whether *at the time the will was executed* the testator was affected by such influence.                              p. 675

But a prayer that requires the jury to determine from the evidence whether the testator was influenced by the caveatee or some other person in making the disposition of his estate shown by the will, is not open to objection on that ground.       p. 675

But such undue influence, to effect the validity of a will, need not be exerted *immediately* and *directly* at the time at which the will was actually being executed. p. 675

Prayers should be drawn with all the brevity consistent with a clear, accurate statement of the law affecting the facts of the case, and prolixitiy or unnecessary repetition tend rather to confuse than to enlighten the jury. p. 676

Unless it appears that the party was injured by the refusal of his prayer, such ruling, even though erroneous, can form no ground for a reversal. p. 675

*Decided December 2, 1913.*

Appeal from the Superior Court of Baltimore City (HEUISLER, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, STOCKBRIDGE, URNER and CONSTABLE, JJ.

*Edgar Allan Poe* (with whom were *J. Kemp Bartlett, L. B. Keene Claggett* and *R. Howard Bland* on the brief), for the appellant.

*W. Thomas Kemp* and *George Whitelock,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal is by the caveators, plaintiffs, from the ruling of the Superior Court of Baltimore City in the trial of issues concerning the will of James Cortland.

The record contains but one bill of exceptions, and that refers only to the action of the Court below in rejecting the

plaintiffs' prayer and to the granting of the "Court's Instruc-
tion," both of which relate to the issue of undue influence.

In order to understand the question we are to consider, it
will be necessary to refer briefly to some of the evidence in
the case. But in doing so we are not to be understood as
emphasizing that part of the evidence to which we shall al-
lude, or as expressing any opinion in regard to its weight.
Where the evidence is legally sufficient to meet the burden of
proof but is conflicting, it is exclusively within the province
of the jury to weigh it, under proper instruction from the
Court upon the law applicable to the facts of the case, and
the jury's conclusions of fact cannot be reviewed on appeal,
and must stand unless there was substantial error in the rul-
ing of the Court.

The testator executed the will in question when he was
eighty-four years old, and died about two years later at his
home on Park avenue, in Baltimore City, leaving an estate
valued at about $85,000.00. The will was dated the first of
June, 1908, and at that time the testator had one son, James
Wakefield Cortland, the appellee, a daughter, Mrs. Norton,
and four grandchildren, viz: Mrs. Diggs, Mrs. Thomas, Ethel
C. Cortland and Clinton W. Cortland, children of Samuel C.
Cortland, who died in 1904. The entire estate was left to the
son, who was unmarried, and the daughter, who was a widow
without children, both of whom were living with the testator
when the will was executed. At that time Mrs. Norton was
in bad health and died in 1909. The will provided that in
case she died before the testator her share of the estate should
go to his son, and under the terms of the will he will receive
the whole estate. Mrs. Diggs, Mrs. Thomas and Clinton W.
Cortland filed a caveat, and the usual issues were sent to the
Superior Court of Baltimore City for trial. The real ground
upon which they assail the validity of the will is that it was
procured by undue influence exerted by James Wakefield
Cortland, the caveatee. According to the evidence produced
by the plaintiffs their father deserted them in 1896, and their
mother was compelled to resort to keeping a boarding house

in Washington, D. C. They had been educated at the expense of the testator, and Mrs. Diggs, and Mrs. Thomas lived with him for some years before they were married. He had always been fond of them, and was "on affectionate terms with" them at the time of his death. Mrs. Diggs' husband failed in business in 1902, and he then moved to Philadelphia, where he and his family lived "in straightened circumstances" from that time until after the death of the testator. Mrs. Thomas, whose marriage was an unhappy one, lived with her mother in Washington. Her health became seriously impaired, and from 1907 to 1909 she was practically confined to her bed. The testator frequently stated that he loved his grandchildren and that he wanted to help them, but that his son did not want him to do so. He told Mrs. Diggs in the spring of 1908 that he had made provision for his grandchildren; that his son did not want him to do it, and wanted the testator to leave his estate to him to provide for them, but that he would see that it was carried out his way. In May, 1908, Mrs. James met the testator near his home on Park avenue. She had assisted Mrs. Diggs during sickness in her family for a number of years. The testator had known her father and was apparently fond of her. He spoke to her and asked her if she would not go into his house with him, saying that his son was out, and that he would like to have a little talk with her. She helped him up the steps of the house, and when they were seated in the parlor he said to her: "Clara, I want to tell you something and I want you to remember this. It will come in some day, and when you see Mrs. Diggs tell her what I say. I love my grandchildren; I love them all. I have made provision for my grandchildren; I have made provision for them all. But they don't want me to do with my money as I want to do with it. Wake wants me to leave my money with him to divide among my grandchildren, but as long as I have the power and strength I am going to have it my way." At that point someone opened the front door of the house; the testator became very nervous and indicated to her to keep quiet. His son, Wake, the caveatee,

came in and told his father to go to his room and lie down. After the testator left the parlor the caveatee told Mrs. James not to talk to his father any more; that he was getting old and childish, and did not know what he was talking about. The will in controversy was executed about two weeks later. It was in the handwriting of the testator, and was "executed in duplicate." There were also two drafts of the will in his handwriting, and they were found in an envelope endorsed in the testator's handwriting as follows: "The will of James Cortland, November 23rd, 1905. Null and void—see will of June first, nineteen hundred and eight." The execution of the will in question took place in the office of Alexander Yearly & Son, and the caveatee states that he accompanied his father to the door of Mr. Yearly's office and waited on the outside until he came out, when the testator told him that he had signed his will, and said to him, "and you will be satisfied."

The appellants say in their brief that all of the issues were abandoned at the trial except the issue of undue influence, and the record shows that that was the only issue submitted to the jury.

At the close of the testimony the plaintiffs, caveators, asked for but one instruction, as follows:

"The plaintiffs pray the Court to instruct the jury that if they shall find from the evidence that James Cortland was influenced by his son, James Wakefield Cortland, or by any other person, in making the disposition of his estate shown by the will offered in evidence; and if they shall find from the evidence that said influence was such as the said James Cortland was too weak or too feeble to resist, and that it deprived him of the power to dispose of his estate according to his own judgment and free will and unconstrained act in reference to the amount and situation of his estate and the relative claims of different persons who were, or should have been, the objects of his bounty, then said influence, if found by the jury, was undue influence, and they should find for the plaintiffs on the third issue, and their answer thereto

should be 'yes;'; and that it is not necessary, in order that they should so find, that such undue influence, if found by them, should have been immediately and directly exerted at the particular time at which the will was made."

The Court below refused to grant this prayer, and in lieu thereof, and of the defendant's sixth and seventh prayers, granted the instruction to which we shall hereafter refer.

Learned counsel for the appellee earnestly contend that the prayer was properly rejected by the Court below because it was calculated to mislead the jury by directing their attention to the proposition that undue influence need not be "directly exerted at the particular time at which the will was made," without further instructing them that such influence, in order to invalidate the will, "must nevertheless be operative upon the testator's mind in the very act of executing it."

It must be conceded that unless the influence, which the law denounces as undue influence, was effective at the time the will was executed, the will cannot be said to be the product of that influence, and it is equally clear that if the plaintiffs' prayer failed to require the jury to find that the testator, at the time the will was made, was impelled by such influence it was fatally defective, regardless of the added instruction. But we do not think that the prayer was open to the objection urged by the appellee. The first question the jury were required to determine from the evidence was whether the testator was influenced by the caveatee, or some other person, "in making the disposition of his estate shown by the will." He could not have been influenced by his son, or some other person, *in making his will,* unless that influence *operated* upon him at the time the will was executed, and the obvious requirement of the prayer was that the jury should find from the evidence that the testator was, at the time the will was made, acting under the influence referred to. That being the plain meaning of the first part of the prayer, there was no reason for repeating it because of the instruction that it was not necessary for the jury to find that the undue influence

was "immediately and directly exerted at the particular time
at which the will was made." Prayers should be drawn with
as much brevity as is consistent with a clear and accurate
statement of the law applicable to the facts of the case, and
undue prolixity or unnecessary repetition tend rather to con-
fuse, than to enlighten the jury. The prayer presented by
the plaintiffs in this case, with the exception of that part to
which we have just referred, is practically the same as the
plaintiff's first prayer in *Hiss* v. *Weik*, 78 Md. 439, which
was as follows: "That if the jury shall find that Edward R.
Ames was influenced by his daughter, Anne Ames Hiss, in
making the disposition of his estate, shown by the will offered
in evidence, and if they find that the extent of her influence
over him in that respect was so great as to deprive him of the
power to dispose of his estate according to his own judgment
and free will in reference to the amount and situation of his
estate and the relative claims of different persons who were
or should have been the objects of his bounty, then said in-
fluence, if found by the jury, was undue influence, and they
should find for the plaintiff on the first and second issues."
JUDGE McSHERRY, referring to that prayer, said: "The ap-
pellee's instruction accurately defined undue influence as
understood in its legal sense, and left to the jury to find from
the evidence the existence of the facts necessary to constitute
such influence." The rulings of the Court below in that case
could not have been affirmed by this Court except upon the
theory that the plaintiff's first prayer, which we have just
quoted, required the jury to find that the will there involved
was the result of undue influence operating upon the testator
at the time the will was executed.

The last proposition contained in the prayer of the plain-
tiffs in the case at bar received the sanction of this Court as
early as the case of *Davis* v. *Calvert*, 5 G. & J. 269, and was
again affirmed in *Moore* v. *McDonald*, 68 Md. 321. In both
of those cases the Court held that it was not necessary that
the undue influence should have been exerted at the time the
will was executed, and in the *Davis Case* an instruction to

that effect was, at the instance of the plaintiff, added by the
Court below to the defendants' sixth prayer. It is the fact
that a will was made in obedience to the dominating and
controlling influence of another that invalidates it, and it
can make no difference whether that influence was imme-
diately exerted at the time of its execution or prior thereto.
The plaintiffs' prayer submitted to the jury the question
whether the testator was influenced by the caveatee, or some
other person, in making his will, and after correctly defining
undue influence, properly instructed them that in determin-
ing whether the will was procured by undue influence, it was
not necessary for them to find that such influence, if found by
them, was exerted at the time the will was made.

The remaining question to be determined is whether the
plaintiffs' prayer is fairly covered by the instruction granted
in lieu thereof, and of the defendant's sixth and seventh
prayers, for unless the plaintiffs were injured by the rejec-
tion of their prayer there is no ground for a reversal of the
ruling of the Court below. That instruction was as follows:

"The Court instructs the jury that the influence which will
avoid the will of a testator must have been exerted on the
testator to such a degree as to have amounted to force or coer-
cion, destroying his free agency, or by importunities that
could not be resisted, so that the motive was equal to force or
fear. It must not have been the influence of affection or at-
tachment, or the mere desire to gratify the wishes of another,
for that would be a very strong ground in favor of the testa-
mentary act, and the burden of proof is upon the caveator in
this case to show not only that such influence existed, but that
it was exerted for the purpose of procuring the execution of
the will offered in evidence in this case and that the same was
obtained by means of undue influence so exerted."

Without questioning the correctness of the legal proposi-
tion presented by this instruction, it is apparent that it en-
tirely ignores the instruction sought in the conclusion of the
plaintiffs' prayer. Prayers should be framed with reference
to the evidence in the case so as to furnish a guide to the jury

in the determination of the questions of fact submitted to them. The evidence produced by the plaintiffs tending to show the exercise of undue influence referred only to the caveatee and his sister, Mrs. Norton. There was no evidence to show that they were present when the testator made the will. On the contrary, it appears that neither of them was in Mr. Yearly's office when the will was executed. Under such circumstances the instruction asked for by the plaintiffs in the concluding lines of their prayer was important for the proper presentation of their theory of the case to the jury, and the refusal of the Court below to grant it was calculated to injure them, especially in view of the instruction granted in the defendant's ninth prayer, not referred to in the plaintiffs' exception, in which the jury was told that discordance between the provisions of the will and the previously or subsequently avowed intention of the testator would not alone authorize the overthrow of said will if the jury found that the testator, at the time of its execution, was *then* free from the *exercise* of undue influence.

As the plaintiffs' prayer was free from objection and was not covered by the Court's instruction, the ruling of the Court below must be reversed.

*Judgment reversed and case remanded for a new trial.*